[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiff, William J. Morrissey, Jr., for himself and for Ta'Agan CT Page 4733 Point Water Company, appeals from the joint final decision of the defendants Department of Public Utility Control ("DPUC") and the Department of Public Health ("DPH") (collectively "the departments") ordering the plaintiff to transfer a parcel of his land to the defendant City of Danbury ("the City") on the ground that this parcel constitutes part of a "water company" that was in need of transfer to a suitable public or private entity. The Office of Consumer Counsel is also a defendant. The court sustains the appeal.
BACKGROUND
The administrative record reveals the following facts. In the 1930's, the plaintiff's father built a spring house to supply water to his home in the Ta'Agan Point area of Danbury. The plaintiff's father began supplying water to several neighbors. In 1953, the plaintiff's father drilled a well on what is known as Lot #IO6054 to provide a more reliable source of water. The plaintiff's parents died in the early 1970's and the plaintiff took over the operation of the water system, which served about fifteen customers. (Return of Record ("ROR"), Vol. 1, p. 17 ¶ 4; p. 35; Vol. II, p. 71; Vol. V, p. 36.) At some point, the system became known as the Ta'Agan Point Water Company ("TPWC"), but TPWC, which is a sole proprietorship, holds no property in its own name. All assets of TPWC are in the plaintiff's name. (ROR, Vol. I, p. 17 ¶ 3; p. 21 ¶ 25.)[1]
In October, 1993, the plaintiff wrote to DPH to inform them that he no longer had the resources, time, and energy to operate the water system. (ROR, Vol. I, p. 35.) On November 15, 1993, DPH issued an order requiring the plaintiff to address deficiencies in the system and to notify its customers that the water did not meet certain bacteriological standards. (ROR, Vol. I, pp. 17-18 ¶¶ 6-7.) After further noncompliance by the plaintiff, litigation ensued. On July 18, 1994, the court approved a stipulated agreement between the parties ("the Agreement"). The Agreement provided that R. J. Black Son, Inc. ("R. J. Black"), would assume operation of TPWC as if it were a receiver until such time as the City was able to incorporate TPWC into its public water system. The Agreement also provided that, if the well located on Lot #IO6054 could no longer be utilized to serve water company customers, the plaintiff would grant an easement to R. J. Black for the purpose of installing a well for use of TPWC customers on Lot #IO6029 ("the Lot"), which the plaintiff owned. (ROR, Vol. I, p. 18 ¶¶ 9-10.)
When R. J. Black assumed operation of TPWC, the system was old and barely adequate. In 1999 and 2000, R. J. Black requested that DPH relieve it as receiver for TPWC due to the deterioration of the water system and associated financial difficulties. (ROR, Vol. I, p. 19 ¶¶ 12, 13.) On CT Page 4734 November 2, 2000, the departments issued a joint notice of an investigation of TPWC and a hearing, pursuant to General Statutes § § 16-46 (a), 16-262n, and 16-262o:
 to determine the actions that may be taken and the expenditures that may be required, including the acquisition of Ta'Agan Point Water Company by a suitable public or private entity, to assure the availability and potability of water, and the provision of water at adequate volume and pressure to the persons served by the Ta'Agan Point Water Company, at a reasonable cost.
(ROR, Vol. I, p. 31.)
After three days of hearings, the hearing officers made the following findings.[2] The TPWC owns and operates a water company, as defined by General Statutes § 25-32a, that provides water service to fourteen residential customers. (ROR, Vol. I, p. 17 ¶¶ 1, 2.)[3] TPWC is incapable of providing adequate, safe drinking water to its customers. The City, which owns the Pleasant Acres Water Company that serves nearby residents, is a suitable entity to assume ownership, management and control of TPWC. (ROR, Vol. I, p. 19 ¶¶ 16-17; p. 21 ¶ 26.) The most economical way for the City to supply water to TPWC customers would be to extend Pleasant Acres' water mains to the TPWC system. If the City elects this option, it will need to install a pressure-reducing station and provide storage, a pump station, and aeration treatment for radon. The most appropriate location for doing so is the Lot. The other options are to install a second well and other equipment on the Lot, or to eliminate the wells and install a hydro-pneumatic tank and other equipment on the Lot. (ROR, Vol. I, pp. 19-20 ¶¶ 19a, 20-22.)
The hearing officers also found that the Lot is undeveloped and is a "necessary water company utility asset" which must be transferred to the City in order to assure the provision of adequate and safe drinking water to TPWC. Further, the Lot is a "direct recharge area of aquifer available for future use to serve TPWC customers and, thus, Lot IO6029 is a potential well site." (ROR, Vol. I, p. 20 ¶ 23.) According to the hearing officers, the Lot is also "Class I water company owned land" as defined in General Statutes § 25-37c. See note 11 infra. (ROR, Vol. I, p. 21 ¶ 24.)
The hearing officers identified the only dispute as whether the Lot "should be ordered transferred to the City as a water company asset which is necessary to provide water to TPWC customers." (ROR, Vol. I, p. 22.) The hearing officers found that "[n]o evidence was offered as to any CT Page 4735 cognizable distinction in ownership, between water company assets and Lot IO6029, other than Mr. Morrissey's bald assertions in this regard." (ROR Vol I, p. 22.) The hearing officers accordingly concluded that "Lot IO6029 is an asset of TPWC which is necessary to assure the availability and safe drinking of water and the provision of water at adequate volume and pressure to TPWC customers and must be transferred to the City." (ROR Vol. I, p. 23.) The decision provided that the plaintiff was entitled to pursue his rights to compensation from the City for the value of the water company as provided by law. See General Statutes § 16-262q. (ROR, Vol. I, pp. 23-24.)
The plaintiff appeals.
DISCUSSION
 I
Under the Uniform Administrative Procedure Act ("UAPA"), General Statutes § 4-166 et seq., judicial review of an agency decision is very restricted. See MacDermid, Inc. v. Department of EnvironmentalProtection, 257 Conn. 128, 136-37, 778 A.2d 7 (2001). Section 4-183 (j) of the General Statutes provides as follows:
 The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
Stated differently, "[j]udicial review of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.) Schallenkamp v.DelPonte, 229 Conn. 31, 40, 639 A.2d 1018 (1994). An administrative finding is supported by substantial evidence if the record affords a CT Page 4736 reasonable basis of fact from which the fact in issue can be reasonably inferred. Dolgner v. Alander, 237 Conn. 272, 281, 676 A.2d 865 (1996). Although the substantial evidence test allows the hearing officer to resolve inconsistencies in the evidence and make credibility determinations, the test requires something beyond conclusory and general statements in the record. Id., 281-82.
 II
The plaintiff's first claim is that the Agreement establishes that he owns the Lot as his own personal property. The plaintiff focuses on the fact that the Agreement contains several paragraphs referring to the Lot as land owned by the plaintiff. (ROR, Vol. I, pp. 49-50 ¶¶ 5, 6.) As the plaintiff admits, however, the status of the Lot as an asset of TPWC was not an issue when the parties entered into the Agreement in 1994. (Plaintiff's Brief, pp. 12, 17.) Further, the preamble to the Agreement provides that the parties agreed on certain matters "without the adjudication of any issues of law or fact, and without [the] Stipulated Agreement constituting any evidence of waiver or admission of any issue of law or fact by either party. . . ." (ROR, Vol. I, p. 48.) Thus, as the hearing officers found, the plaintiff cannot legitimately claim that the defendants made an admission in the Agreement that the Lot was not a TPWC asset. (ROR, Vol. I, p. 23.)[4]
The plaintiff's related argument is that the departments' administrative action breaches paragraph 9 of the Agreement. This paragraph provides that DPH "shall not pursue penalties or administrative or judicial action against William J. Morrissey for violations of [the 1993 order], or any violations arising from the operation of the well system during the time that the R. J. Black Co. is acting as the receiver for the Ta'Agan Point Water Co., provided the terms of this Stipulated Agreement are in effect." (ROR, Vol. I, pp. 51-52.) The administrative action in this case, however, does not constitute an enforcement procedure against the plaintiff for "violations." Rather, the administrative proceedings were essentially in response to "a request from a water company to cease its operations or discontinue the provision of water service" pursuant to General Statutes § 16-46 (a).[5]
Therefore, the proceedings did not violate the agreement.
 III
The plaintiff's main contention is that the departments had no authority to acquire the Lot because it is private property of the plaintiff that was not used for TPWC. As stated, the hearing officers found that the Lot is a "necessary water company utility asset" and "Class I water company owned land." (ROR pp. 20-21 ¶¶ 23, 24.) CT Page 4737 Although the hearing officers did not directly tie these findings into a statutory standard that would authorize acquisition, their findings essentially mean that the Lot is part of a "water company" for purposes of General Statutes § 16-262n (c). This section authorizes the departments, upon receipt of a request from a water company to cease operations filed pursuant to section 16-46, to "determine the actions that may be taken and the expenditures that may be required, including theacquisition of the water company by a suitable public or private entity, to assure the availability and potability of water and the provision of water at adequate volume and pressure to the persons served by the water company at a reasonable cost." (Emphasis added.)[6]
The court must thus determine whether there was a sufficient basis to conclude that the plaintiff's lot is not merely private property but was also a "water company utility asset."[7] Because this finding appears to have both a factual and a legal component, the court must look to see "whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable." (Internal quotation marks omitted.) Schallenkamp v. DelPonte, supra, 229 Conn. 40.
The hearing officers cited to three pages of transcript and one exhibit to support the paragraph containing the finding that the Lot is a "water company utility asset." (ROR, p. 20 ¶ 23.) An examination of these references reveals no support for the proposition that the Lot is a TPWC asset. Thus, in fact, the hearing officers did not cite any evidence in the record that the Lot was an asset of the water company.
In their briefs, the departments support the hearing officers' finding that the Lot is an asset of TPWC with the following excerpt from the questioning of the plaintiff at the hearing by a representative of the City:
 Q And that's the question I have for Mr. Morrissey, is the property, the lot that's in your name in this development, and I could identify it by lot number if there is a question about which one I'm speaking about, is that part of the water company?
A No.
Q Okay. Well —
A Can I add some other points?
Q Sure. CT Page 4738
 A Okay. The concern of that property, because before this — you know, we're talking about a situation that just didn't happen overnight. We're talking about after my parents died and let's say in the "77 period, "78 period, we probably put an eighth of an [sic] mile in of improvements of new plastic pipe, distribution to four homes. And we had looked at that ourselves as potential, okay, where else could you drill a well because we had discussions with Mr. Black years ago and other people. In that area, you probably have, what, seventy five feet away or two homes, which my brothers owned at one time. And there was septic tanks there. I mean I don't know if the city has looked into that. You have septic tanks fairly close on several sides of, parts of that lot. You also had a well that was abandoned by my father years ago because it became contaminated.
(ROR, Vol. II, pp. 13-14.)
Based on the testimony that the Lot "also had a well that was abandoned by my father years ago because it became contaminated" and the testimony that the Lot served as a potential well site, the departments argue that there was substantial evidence to support the hearing officers' finding that the Lot is an asset of TPWC.[8] The court disagrees. To begin with, it is not clear, as a factual matter, whether the abandoned well was used for TPWC customers. For that matter, it is not clear precisely when the plaintiff's father used the now-abandoned well and when the water system reached the status of "water company." Thus, there is uncertainty whether the plaintiff's father used the well before or after the formation of TPWC.
It is also not clear what the plaintiff meant by "we had looked at that ourselves as potential, okay, where else could you drill a well because we had discussions with Mr. Black years ago and other people." Given that the plaintiff immediately thereafter referred to the septic tanks on the Lot and the fact that the well was contaminated, the plaintiff apparently did not see much potential water company use in the Lot. Although the hearing officers could have resolved these factual ambiguities in the departments' favor, the fact that they did not rely on this testimony at all in their findings suggests that they did not view it as supporting their decision. Given that there is no other evidence that the Lot was used for water company purposes, the court concludes that there is not substantial evidence to support the factual finding that the Lot is a water company asset. CT Page 4739
Even assuming that the plaintiff's father did use the Lot for a well that sewed TPWC customers, the plaintiff's parents died in the early 1970's and thus, at best, the well was used approximately thirty years ago. This presumed fact raises the legal issue of whether the Lot is still a water company asset. The court agrees with the defendants that, because TPWC is a sole proprietorship, the mere fact that title to the Lot is in the individual plaintiff's name does not negate the possibility that the Lot is part of TPWC. See Chmielewski v. Aetna Casualty SuretyCo., 218 Conn. 646, 668, 591 A.2d 101 (1991). But beyond this principle, there is very little guidance in the statutes and case law. There is nothing in the definition of "water company" in General Statutes §16-262n or elsewhere in the statute that provides that the "water company" subject to acquisition includes assets that the water company abandoned decades earlier. See note 3 supra. Nor did the departments establish that they have traditionally interpreted "water company" to include abandoned assets so that this court should defer to such an interpretation. See MacDermid, Inc. v. Department of EnvironmentalProtection, supra, 257 Conn. 137.
DPH contends that General Statutes § 25-33 l provides authority for the proposition that water company assets include not merely those in current use, but also abandoned and potential assets. General Statutes § 25-33 l addresses the sale by a water company of a source, potential source, or abandoned source of water supply.[9] The statute appears to assume that the abandoned or potential source of water is a currently an asset of a water company. The statute does not purport to define the circumstances under which an abandoned water source shall be deemed a current asset of a water company, especially for purposes of an acquisition of assets under § 16-262n (c).
The departments' argument reduces to the proposition that, once an asset is used for business purposes, it is always a business asset. This proposition seems contrary to the law in several areas. For example, the fact that an individual uses a home office for business purposes during one year and properly deducts associated expenses under the applicable test does not mean that he has satisfied that test in subsequent years, when the facts may differ. See generally Commissioner v. Soliman,506 U.S. 168 (1993). Similarly, if an owner, including a business owner, does not use a piece of real property for a period of fifteen years, it is subject to taking by another entity under the law of adverse possession. See Woycik v. Woycik, 13 Conn. App. 518, 520, 537 A.2d 541
(1988); see also Cargill, Inc. v. Hedge, 375 N.W.2d 477, 478-79 (Minn. 1985) (property in corporate name was, in reality, private property for purposes of homestead exemption from judgment creditors). Thus, to conclude, as a matter of law, that property is an asset of a water CT Page 4740 company because it was used approximately thirty years ago for a well is to lean upon a slender reed.
Essentially, the departments in this case ask for eminent domain power to condemn private property for public use on the ground that the property may have some history of use in a water system. This power is a considerable one, as many private properties would meet this description. While the legislature undoubtedly has the power to authorize such broad governmental power, and it may have done so in other statutes, it has not done so in § 16-262n (c). As our Supreme Court has recently reiterated, statutes authorizing the exercise of eminent domain are to be strictly construed against the condemnor. See Aposporosv. Urban Redevelopment Commission, 259 Conn. 563, 573, ___ A.2d ___ (2002).[10] Strictly construing § 16-262n (c), there is nothing in its language authorizing "the acquisition of the water company by a suitable public or private entity" that empowers the government to condemn private property that merely constitutes an abandoned asset of a water company without constituting a current asset of the company. Accordingly, the hearing officers erred in finding that the Lot was a water company asset subject to acquisition under § 16-262n (c).
The defendants also rely on the finding that the Lot was "Class I water company owned land as defined by General Statutes § 25-37c."[11] At the outset, it is not clear how denominating the Lot as Class I land enhances the departments' authority to acquire property under General Statutes § 16-262n (c). In any case, the hearing officers supplied no citations at all to support the finding that the Lot was "Class I water company owned land." (ROR, Vol. I, p. 21 ¶ 24.) The hearing officers made a preliminary finding that the Lot was a "direct recharge area of aquifer available for future use," thus suggesting that the Lot was the type of land that would qualify under subsection (a)(5) of the definition; see note 11 supra; but an examination of the citations to the record for this finding reveals no support for it. (ROR, p. 20 ¶ 23.) Regardless of the physical characteristics of the Lot, there is no more support for finding that the Lot was "water company owned land" under General Statutes § 25-37c than there is for finding that the Lot is a "water company asset" under § 16-262n. In either event, the hearing officers lacked substantial evidence and a reasonable basis to support their finding and conclusion. Accordingly, the hearing officers erred in ordering the transfer of Lot #IO6029 to the City.
CONCLUSION
The appeal is sustained and the case is remanded to the departments to vacate their decision insofar as it orders the transfer of Lot #IO6029 to the City. CT Page 4741
Carl J. Schuman Judge, Superior Court