[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The plaintiffs[1] appeal from a March 1, 2001 declaratory ruling issued by the defendant, Connecticut Siting Council ("the siting CT Page 2266 council"), relating to a power plant proposed to be built in the town of Oxford by the defendant, Towantic Energy LLC ("Towantic"). This appeal is authorized by General Statutes §§ 4-176 (h) and 4-183 of the Uniform Administrative Procedure Act ("UAPA").[2]
The administrative record provides the following relevant facts. On December 7, 1998, Towantic filed an application with the siting council for a certificate of environmental compatibility and public need ("certificate") for the construction, maintenance and operation of an electric generating facility primarily fueled by natural gas and to be located in Oxford, Connecticut. In the course of the proceedings, a predecessor of Citizens and Trout became parties and Middlebury became an intervenor. On June 23, 1999, the siting council issued its findings of fact, opinion, and decision and order granting a certificate to Towantic for the facility. (Return of Record ("ROR"), Item 1.)
The siting council found that the proposed project "can be developed in a manner to provide a clean and reliable source of electric generation, minimize community and environmental impacts, and provide economic benefits to the Town of Oxford and the State of Connecticut." (ROR, Item 1, Opinion, Docket No. 192, p. 5.) The opinion continued, "the Council will issue a Certificate for this facility, accompanied by orders including a detailed Development and Management Plan (D M Plan) with elements designed to protect resources on site and mitigate impacts off site." (ROR, Item 1, Opinion, Docket No. 192, p. 5.)
The siting council in its decision and order approved, pursuant to General Statutes § 16-50p, Towantic's application to construct, operate, and maintain "a 512 MW natural gas-fired combined cycle facility." (ROR, Item 1, Decision and Order, Docket No 192, p. 1.) A certificate, as required by General Statutes § 16-50k, was issued to Towantic, subject to several conditions, including but not limited to: (1.) that the facility be constructed and operated by Towantic; (2.) that the project operate on natural gas, except during curtailment of natural gas when the project may operate on low sulfur fuel oil; and, (3) that Towantic shall develop an emergency response plan drafted in cooperation with local and state public safety officials. (ROR, Item 1, Decision and Order, Docket No. 192, p. 1.)
In addition, one of the elements of the D M plan in the decision and order required Towantic to set forth:
A final site plan showing all roads, structures and other improvements on the site. The final site plan shall, to the greatest extent possible, reduce the height of facility in conjunction with the shifting CT Page 2267 the proposed site, up to 500 feet south, to maximize placement of facility components within the existing field; preserve the existing natural vegetation on the site; and minimize impacts on inland wetlands.
(ROR, Item 1, Decision and Order, Docket 192, p. 1.)
Another element in the D M plan required Towantic to make:
 Provisions for adequate water supply while operating on oil and for adequate oil storage, unloading, and pumping facilities including tanker queuing and turn-around areas sufficient to allow for the arrival of four trucks per hour, to ensure continuous burn on oil for up to 720 hours per year during natural gas curtailment.
(ROR, Item 1, Decision and Order, Docket 192, p. 2.)
Citizens appealed from this decision and after a hearing, the Superior Court dismissed the plaintiff's appeal on November 14, 2000, concluding that substantial evidence supported the decision of the siting council.Citizens for the Defense of Oxford v. Connecticut Siting Council, Superior Court, judicial district of New Britain, Docket No. 497075 (November 14, 2000, Satter, J.T.R.) Citizens then appealed to the Appellate Court but on May 19, 2001, the appeal was withdrawn. (ROR, Item 4.)
On or about October 20, 2000, Towantic filed its proposed D M plan. (ROR Item 6.) On November 2, 2000, the plaintiffs petitioned for a declaratory ruling, requesting the siting council to determine, in relevant part: (1.) Whether Towantic was still effectively the certificate holder, or whether Calpine Eastern Corporation ("Calpine") improperly submitted the D M plan; (2.) Whether the terms of the siting council's final decision were violated in the submitted D M plan by the failure of the plant to be moved "up to 500 feet south"or whether the certificate was improperly amended; (3.) Whether the water supply plan in the D M plan was unworkable and improperly submitted. (ROR, Item 8, pp. 1-2, 6-8.)
On March 1, 2001, the siting council approved the D M plan and made the following relevant conclusions to the plaintiff's requests. First, the siting council rejected the claim that Towantic is not the certificate holder. The siting council determined that Towantic was a valid business entity, its business relationship with Calpine was not CT Page 2268 illegal and would not hinder enforcement, and Calpine was forthright in documenting its purchase of Towantic with plans to operate the facility under Towantic's name. Second, as to the 500 foot provision in the decision, the exact language was "to the greatest extent possible . . . shifting the proposed site, up to 500 feet south, to maximize placement of facility components within the existing field. . . ." While it was claimed that in the proposed D M plan the site was not moved to the south by 500 feet, the siting council believed the site compaction and reorientation of facility components in the D M plan were in compliance with its decision. Third, the decision noted that accommodation had to be made for four trucks per hour delivering oil, if the natural gas supply was interrupted as well as adequate water supply. In the proposed D M plan, Towantic added an additional four trucks per hour to bring in additional water supplies, due to the inability of the Heritage Water Company to meet Towantic's demand entirely. The additional truck traffic would not be excessive and would only occur infrequently when natural gas is not available.
The plaintiffs again have appealed to this court from the siting council's decision and order on their request for declaratory ruling.[3]
The court must first address the issue of aggrievement.[4] The standard for aggrievement has been stated by our Supreme Court as follows: "The fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected. . . ." (Brackets omitted; citations omitted; internal quotation marks omitted.) New England Cable Television Assn., Inc. v. DPUC,247 Conn. 95, 103 (1998); see also Bethlehem Christian Fellowship, Inc.v. Planning Zoning Commission, 58 Conn. App. 441, 447 (2000) ([s]tanding is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. . . .") (Citations omitted; internal quotation marks omitted.)
With respect to the town of Middlebury, the ten-term First Selectman of Middlebury and Director of Public Works, Edward B. St. John, testified at the hearing before this court that his town borders on Oxford and that the proposed power plant is just over the border. Middlebury as a contiguous town has issues with the siting council's views on who is the proper certificate holder, with the procedure leading to the location of CT Page 2269 the facility and with the increased truck traffic allowed under the D M plan.
Based on his testimony, aggrievement is found for Middlebury. First, it has a specific personal and legal interest as "representative of the public interests of all its inhabitants. . . ." Milford v. Commissioner ofMotor Vehicles, 139 Conn. 677, 681 (1953); Guilford v. Landon,146 Conn. 178, 179 (1959); see also Cromwell v. Inland Wetlands Watercourses Agency, Superior Court, judicial district of Middlesex at Middletown, Docket No. 065192 (September 15, 1993, Gaffney, J.) (standing for two towns that border the regulated activities in question). As to the "injury in fact" requirement, there exists a possibility that Middlebury's interests, as stated by the First Selectman, may be affected due to the siting council's replies to the declaratory ruling, and this is sufficient injury under aggrievement law.[5]
Having resolved the issue of aggrievement, the court will next proceed to consider the merits of the case as raised by the plaintiffs. The court uses the following standard in evaluating the claims: "Judicial review of [an administrative agency's] action is governed by the Uniform Administrative Procedure Act [General Statutes § 4-166 et seq. (UAPA)] . . . and the scope of that review is very restricted. . . . With regard to questions of fact, it is [not] the function of the trial court . . . to retry the case or to substitute its judgment for that of the administrative agency. . . ." (Citations omitted; internal quotation marks omitted.) MacDermid, Inc. v. Dept. of Environmental Protection,257 Conn. 128, 136 (2001) "This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . The burden is on the [plaintiff] to demonstrate that the [agency's] factual conclusions were not supported by the weight of substantial evidence on the whole record. . . ." (Citations omitted; internal quotation marks omitted.) Id., 136-37. "Even as to questions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . ." (Internal quotation marks omitted.) Id., 137; see also Assn. ofNot-for-Profit Providers for the Aging v. Dept. of Social Services,244 Conn. 378, 389 (1998) (stating the rule in the context of review of a declaratory ruling.)
The plaintiffs' first contention is that the siting council erred in not requiring Towantic to petition the siting council for a transfer of its certificate to Calpine. This argument is based upon an interpretation of General Statutes § 16-50k (a) providing that no person" may develop a facility without a certificate from the siting council. Under General Statutes § 16-50k (b), a certificate may be transferred, CT Page 2270 subject to the approval of the siting council, to "a person who agrees to comply with the terms, limitations and conditions contained therein." The word "person" includes "any . . . corporation, limited liability company, joint venture . . . and any other entity, public or private, however organized." General Statutes § 16-50i (c).
The plaintiffs argue that Calpine's name should be on the certificate and Towantic should seek the approval of the siting council to transfer the certificate to Calpine. The plaintiffs allege that Towantic is merely a shell entity for the real party in interest, Calpine, which prepared the D M plan. The court rejects this attempt to hold the siting council at fault for not analyzing the structure of an limited liability company after it has received a certificate through the application process. This would vary the explicit language of the statutes quoted above that allow a limited liability company to hold a certificate without limitation as a "person." It has been repeatedly held that the primary rule of statutory construction is that "[i]f the language of the statute is clear, it is assumed that the words themselves express the intent of the legislature; . . . and thus there is no need to construe the statute." Anderson v.Ludgin, 175 Conn. 545, 552 (1978); Wrinn v. State, 234 Conn. 401, 405
(1995); Ferrato v. Webster Bank, 67 Conn. App. 588, 592 (2002). By statute, any limited liability company may become a certificate holder and is not automatically forced to apply for a transfer of the certificate to the parent entity.
The only reason given by the plaintiffs to require Towantic to transfer its certificate to Calpine, is the plaintiffs' concern that enforcement would become more difficult if the subservient entity is left as the operator, and not the ultimate owner. The law does not support this conclusion, as the state and local officials or the siting council may take any action they deem appropriate if Towantic violates its certificate. Enforcement would include seeking to revoke the certificate as well as applying remedies against Calpine. See, e.g., Baston v. RJM Associates, Superior Court, judicial district of Hartford, Docket No. 593189 (June 4, 2001, Beach, J.) (allowing an action against an individual partner of a limited liability company).
The siting council, based on the record as it existed in Docket Numbers 192 and 492[6], fully answered the plaintiffs in its March 1, 2001 declaratory ruling: Towantic is a valid business entity, its relationship with Calpine is not illegal, and Calpine fully disclosed its relationship with Towantic to the siting council. Therefore, the court finds that the siting council properly ruled on this issue as raised in the request for a declaratory ruling.
The second issue raised by the plaintiff is that the siting council CT Page 2271 failed to hold a hearing when approving the D M plan to decide whether the facility should have been moved southerly from its initial location. They contend that there should have been an amended certification process pursuant to § 16-50l (d). However, under General Statutes § 16-50p
(d): "If the council determines that the location of all or a part of the proposed facility should be modified, it may condition the certificate upon such modification, provided the municipalities, and persons residing or located in such municipalities, affected by the modification shall have had notice of the application as provided in subsection (b) of section 16-50l." This provision is a link to § 16-50l (d).
In its final decision (Decision and Order, Docket No. 192), (ROR, Item 1, pp. 1-4), the siting council did not provide such a condition. Instead, the siting council added to its order a directive that the D M plan contain a final site plan, shifting the proposed site, to the greatest extent possible, up to 500 feet south. (ROR, Item 1, pp. 1-2.) The decision and order of the siting council was affirmed by this court and cannot now be challenged on its decision not to make the move to the south a condition of the certificate. Since the siting council did not condition its permit on relocation, or require further notice or a hearing on location in its order, there was no error in the siting council's merely reviewing the proposed D M plan for compliance.[7]
The siting council logically conclude that the D M plan sets forth an attempt to contract the facility and to retain existing vegetation as a boundary line, and that this satisfies the requirements of the final decision regarding the D M plan.
The plaintiffs' final issue is that the D M plan exceeded its scope by approving Towantic's plan to increase truck traffic to the site. Clearly, the D M plan functions to "fill up the details" in the siting council's final decision. Cf. State v. Stoddard, 126 Conn. 623, 628
(1940) (legislature may delegate to agency to fill up details). The D M plan cannot provide a substitute for matters not addressed during the application process. Westport v. Connecticut Siting Council, Superior Court, judicial district of New Britain, Docket No. 501129 (June 27, 2001, Cohn, J.), appeal pending, S.C. Nos. 16600, 16601. Under analogous regulations of the siting council, the purpose of D M plans for electric transmission lines and communications towers is to help "significantly in balancing the need for adequate and reliable utility services at the lowest reasonable cost to consumers with the need to protect the environment and ecology of the state." Regs., Conn. State Agencies §§ 16-50j-60, 16-50j-75.
Here, the decision and order, ROR, Item 1, p. 2, requires Towantic to set forth the means of bringing an adequate water supply to the site, at such time as the power plant must use oil for fuel. Towantic explains in CT Page 2272 the D M plan that it cannot supply all water needs by the Heritage Water Company and must use truck water to complete the siting council's requirements. (ROR, Item 6, Tab D, p. 3.) Since the final decision provided for the transmission of water to the site, the siting council did not abuse its discretion in approving in the D M plan the use of additional trucks to accomplish this directive. The siting council appropriately gave its approval noting that the use of water trucks would not be a great environmental burden and would only occur where the supply of natural gas was suspended.
The court concludes that the siting council has not acted unreasonable, arbitrarily, illegally or in abuse of its discretion in its response to the request for a declacatory ruling.
Therefore, the plaintiffs' appeal is dismissed.
Henry S. Cohn, Judge