**WHEELING–PITTSBURGH STEEL CORPORATION and American Iron Oxide Company, Petitioners**

**v.**

**DEPARTMENT OF ENVIRONMENTAL PROTECTION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 5, 2009.
Decided Aug. 6, 2009.

---

Paul K. Stockman, Pittsburgh, for petitioners.

John H. Herman, Pittsburgh, for respondent.

BEFORE: LEADBETTER, President Judge, COHN JUBELIRER, Judge, and FRIEDMAN, Senior Judge.

OPINION BY President Judge LEADBETTER.

Wheeling–Pittsburgh Steel Corporation (Wheeling Steel) and American Iron Oxide Company (AMROX) (collectively, Petitioners) petition for review of the orders of the Environmental Hearing Board (EHB) that affirmed, as modified, the decision of the Department of Environmental Protection (DEP) and denied Petitioners' petition to reopen the record to present additional evidence. DEP granted AMROX a variance from the classification of "spent pickle liquor" as a solid waste regulated by the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. §§ 6901–6992k, and the federal hazardous waste regulations adopted by DEP. In granting the variance, DEP imposed certain conditions, one of which was modified by EHB. Petitioners challenge DEP's authority to regulate spent pickle liquor as a solid/hazardous waste. They assert that the spent pickle liquor is exempt from the definition of a solid waste under the regulations. In the alternative, they argue that two conditions imposed by DEP are unreasonable. They also question EHB's refusal to reopen the record.

### I.

EHB made the following relevant findings based on the evidence presented at hearings. Steel manufacturers treat steel utilizing a process known as "pickling," which involves running rolled sheets of steel through hydrochloric acid (HCl) solution. During this process, iron scale build-up (rust) on the surface of the steel is removed when it reacts with the hydrochloric acid to form iron chloride ($FeCl_2$). After a continued use, the hydrochloric acid solution loses its effectiveness to treat the steel due to the weakened hydrochloric acid properties and the presence of iron

chloride, water and heavy metals and must be replaced with fresh hydrochloric acid solution. This used hydrochloric acid solution is referred to as "spent pickling liquor" or "ferrous chloride solution."[1] The spent pickle liquor is a "spent material," which is defined as "any material that has been used and as a result of contamination can no longer serve the purpose for which it was produced without processing." 40 C.F.R. § 261.1(c)(1). The spent pickle liquor is contaminated with numerous toxic metals, such as lead, copper, zinc and chromium, and is corrosive. It is designated as a "KO62" hazardous waste and must be disposed of at a hazardous waste disposal facility or sent to a recycling facility. 40 C.F.R. § 261.32(a).

Under Section 104(1) and (6) of the Solid Waste Management Act, Act of July 7, 1980, P.L. 380, *as amended*, 35 P.S. §§ 6018.104(1) and (6), DEP has the authority and responsibility to "administer the solid waste management program, including resource recovery and utilization" and to "regulate the storage, collection, transportation, processing, treatment and disposal of solid waste." In 1995, AMROX obtained a "permit-by-rule"[2] from DEP and began processing spent pickle liquor at its facility located in Allenport,

Pennsylvania. AMROX received spent pickle liquor for processing from steel rolling facilities including Wheeling Steel, which operates facilities in Ohio and in Allenport, Pennsylvania, adjacent to the AMROX's facility. In 1996, AMROX also obtained a conditional concurrence of a co-product determination for "waste pickle liquor" from DEP, which stated that the "spent pickle liquor . . . becomes a substitute for commercial ferrous chloride solution and therefore may be managed as a co-product."[3] Petitioners' Exhibit No. 13; Reproduced Record (R.R.) at 240a.

Currently, AMROX receives spent pickle liquor from Wheeling Steel's Allenport facility through pipes and from other generators' facilities by trucks. AMROX first places the spent pickle liquor in 35,000-gallon, above-ground storage tanks. The spent pickle liquor is then pumped into a Venturi scrubber/separator to remove excessive water, debris and other impurities. The next step is to spray a fine mist of spent pickle liquor into a gas-fired, high-heat spray roaster. During this process, known as pyrohydrolysis, molecules of the spent pickle liquor dissociate into individual atoms and react with oxygen to form hydrochloric acid (HCl) and iron oxide ($Fe_2$

---

1. The Environmental Protection Agency describes "pickling" as follows:

   The pick[l]ing operation involves the immersion of oxidized steel in a heated solution of concentrated acid or acids (the pickling agent) to remove surface oxidation or to impart specific surface characteristics. . . . After a certain concentration of metallic ions build up in the pickling bath, the solution is considered spent or exhausted and must be replaced.
   DEP's Exhibit No. 1, Background Document, Subtitle C—Identification and Listing of Hazardous Waste (1980); Reproduced Record (R.R.) at 523a–24a.

2. Under 25 Pa.Code § 266.90(a) then in effect, operators of recycling facilities were

"deemed to have a recycling permit" if they "reclaim hazardous waste onsite" and meet certain conditions. DEP's Exhibit No. C–65; R.R. at 881a.

3. At that time, the regulations defined "co-product" as a "[m]aterial generated by a manufacturing or production process, or an expended material, of a physical character and chemical composition that is consistently equivalent to the physical character and chemical composition of an intentionally manufactured product or produced raw material, provided that the use of the material presents no greater threat of harm to human health or the environment than the use of the product." DEP's Exhibit No. 3; R.R. at 539a.

$O_3$). Appellants' expert witness, Dr. Richard McCullough, who is a chemistry professor and dean of Carnegie–Mellon University, described the process as follows: "4FeCl$_2$ [iron chloride] + 4H$_2$O + O$_2$ → 2Fe$_2$O$_3$ + 8HCl." Dr. McCullough's Report at 4; R.R. at 313a.

AMROX removes the iron oxide that falls to the bottom of the spray roaster and sells it for use as coolants or for magnetic applications. AMROX transfers the hydrochloric acid in the spray roaster into an absorber and mixes it with water to produce hydrochloric acid with an 18% concentration.[4] The newly generated hydrochloric acid is sent back to Wheeling Steel and other steel rolling facilities that treat the steel. AMROX's operation also generates spent pickle liquor sludge, a hazardous waste, which is sent to an off-site facility for proper disposal. DEP's Exhibit No. 14 (Consent Assessment of Civil Penalty); R.R. at 714a. Under the contracts with AMROX, the spent pickle liquor generators pay AMROX monthly fees for "regeneration services" for converting "waste hydrochloric acid pickle liquor" into iron oxide and hydrochloric acid. R.R. at 542a and 558a.

RCRA provides that "[a]ny state which seeks to administer and enforce a hazardous waste program pursuant to this subchapter [Subchapter III-Hazardous Waste Management] may develop and ... submit to the Administrator [of the Environmental Protection Agency (EPA)] an application ... for authorization of such program." 42 U.S.C. § 6926(b). On April 30, 1999, DEP adopted 25 Pa.Code Chapter 261a (effective May 1, 1999), incorporating by reference most of 40 C.F.R. Part 261 ("Identification and Listing of Hazardous Waste") promulgated under RCRA. 25 Pa. Code § 261a.1. In 2000, EPA approved DEP's new hazardous waste regulations. The previous procedures for permitting the handling of the hazardous waste through a "permit-by-rule" and a "co-product determination" are no longer available under the new regulations.

In September 1999, Petitioners requested DEP's concurrence that the spent pickle liquor received by AMROX from Wheeling Steel and United States Steel Corporation (U.S. Steel) is not a solid waste subject to the hazardous waste regulations. DEP denied AMROX's request but indicated that it would prepare a document to grant a variance.[5] On April 6, 2005, DEP granted AMROX a variance "for covered sources of spent pickle liquor that is used as iron oxide manufacturing feedstock," subject to thirteen conditions. R.R. at 212a. Condition No. 5 limited the covered spent pickle liquor generators to Wheeling Steel, U.S. Steel and ISG Weirton Steel Corporation; other steel manufacturers were required to obtain DEP's prior written approval to supply spent pickle liquor to AMROX. Condition No. 6 required covered generators to analyze the spent pickle liquor for specified maximum and minimum ferrous chloride, maximum hydrochloric acid and maximum fluoride at least on a quarterly basis. They must also analyze the spent pickle

---

4. AMROX can produce a higher concentration of hydrochloric acid by removing silica and other metals utilizing a process known as IROX. Notes of Testimony (N.T.) at 161; R.R. at 55a.

5. DEP is authorized to grant a variance from the solid waste classification, on a case-by-case basis, for the following materials: "(a) Materials that are accumulated speculatively without sufficient amounts being recycled ...; (b) Materials that are reclaimed and then reused within the original production process in which they were generated; and (c) Materials that have been reclaimed but must be reclaimed further before the materials are completely recovered." 40 C.F.R. § 260.30.

liquor for parameters of nineteen specified metals, such as lead, aluminum, chromium, copper and zinc, at least on an annual basis.

In granting the variance, DEP rejected Petitioners' claim that the spent pickle liquor is not subject to DEP's solid waste regulations. A "solid waste" is "any discarded material," unless specifically excluded by the regulations from such classification. 40 C.F.R. § 261.2(a)(1). A "discarded material" is any material which is, *inter alia*, "abandoned," "recycled" or "considered inherently waste-like." 40 C.F.R. § 261.2(a)(2). A material is "recycled" "if it is used, reused, or reclaimed." 40 C.F.R. § 261.1(c)(7). A solid waste exhibiting ignitability, corrosivity, reactivity or toxicity is regulated as a hazardous waste. 40 C.F.R. §§ 261.3(a) and 261.20–24. Petitioners acknowledge that the spent pickle liquor would be subject to the hazardous waste regulations if it constitutes a solid waste.

AMROX and Wheeling Steel filed separate appeals from DEP's grant of a variance, which were consolidated by EHB. Petitioners claimed that the spent pickle liquor is exempt from the solid waste classification under 40 C.F.R. § 261.2(e)(1)(i) and (ii). Section 261.2(e)(1) provides in relevant part:

> (e) *Materials that are not solid waste when recycled.* (1) Materials are not solid wastes when they can be shown to be recycled by being:
>
> (i) Used or reused as ingredients in an industrial process to make a product, provided the materials are not being reclaimed; or
>
> (ii) Used or reused as effective substitutes for commercial products; or
>
> (iii) Returned to the original process from which they are generated, without first being reclaimed or land disposed.

Petitioners also argued that the conditions imposed by DEP were unreasonable.

EHB determined that the spent pickle liquor is not exempt from solid waste classification under 40 C.F.R. § 261.2(e)(1)(i). EHB concluded that AMROX's operation constitutes reclamation of the spent pickle liquor because it removes contaminants from the spent pickle liquor and restores the hydrochloric acid to a usable condition. EHB further determined that the spent pickle liquor is not eligible for an exemption under 40 C.F.R. § 261.2(e)(1)(ii). EHB found that AMROX reclaims a waste product for the steel industry by turning it into reusable materials and that the production of hydrochloric acid and iron oxide is only secondary to its primary function as a spent pickle liquor processor. EHB further found that DEP's 1996 co-product determination is not controlling in deciding eligibility for an exemption under 40 C.F.R. § 261.2(e)(1)(ii). EHB concluded that Condition Nos. 5 and 6 are reasonable and necessary to ensure that the spent pickle liquor is within the requisite chemical parameters, does not cause air pollution and is not harmful to AMROX's process. The Board modified Condition No. 3 and permitted AMROX to store up to 25% of iron oxide produced annually.

EHB accordingly affirmed DEP's grant of variance, as modified, and issued a separate order denying Petitioners' petition to reopen the record for the purpose of permitting them to present additional evidence, which allegedly supported their position that the spent pickle liquor is exempt from the solid waste regulations. Petitioners' appeal to this Court followed.

## II.

Petitioners first argue that DEP and EHB misconstrued 40 C.F.R. § 261.2(e)(1)(i), which exempts materials "[u]sed or reused as ingredients in an in-

dustrial process to make a product" from the solid waste regulations, when such materials are not "reclaimed." Petitioners maintain that AMROX's operation does not involve "reclamation" or "restoration" of the spent pickle liquor. They assert that AMROX neither removes any "significant" amount of contaminants from the spent pickle liquor nor restores any "significant" amount of hydrochloric acid. Petitioners' Brief at 22. They claim that AMROX instead manufactures new products from the spent pickle liquor and does not restore it to its original usable condition.[6]

■ Congress enacted RCRA to establish a "cradle-to-grave" regulatory scheme to provide safe treatment, storage and disposal of hazardous waste. *Envtl. Defense Fund v. Envtl. Prot. Agency*, 210 F.3d 396 (D.C.Cir.2000). It is well-settled that any exception to the general provision promoting the legislative purpose or mandate should be narrowly construed. *Borough of Youngwood v. Pa. Prevailing Wage Appeals Bd.*, 596 Pa. 603, 947 A.2d 724 (2008); *Gen. Motors Corp. v. Unemployment Comp. Bd. of Review*, 948 A.2d 256 (Pa. Cmwlth.2008). Petitioners had the burden of proving that DEP's action was arbitrary or amounted to an abuse of discretion. 25 Pa.Code § 1021.122(c)(3); *Shenango Inc. v. Dep't of Envtl. Prot.*, 934 A.2d 135 (Pa. Cmwlth.2007).

■ The object of statutory interpretation is to ascertain and effectuate the intention of the legislature. Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a); *Pa. Associated Builders & Contractors, Inc. v. Commonwealth Dep't of Gen. Servs.*, 593 Pa. 580, 932 A.2d 1271 (2007). Every statute must be con-

strued, if possible, to give effect to all of its provisions. *Id.* Further, statutes or parts of statutes are in *pari materia* when they relate to the same persons or things or to the same class of persons or things and must be construed together, if possible. 1 Pa.C.S. § 1932. Statutory construction rules apply equally to the interpretation of administrative regulations. *Bayada Nurses, Inc. v. Dep't of Labor & Indus.*, 958 A.2d 1050 (Pa.Cmwlth.2008).

■ As an agency responsible for enforcing and implementing environmental statutes and regulations, DEP is "in the best position to interpret" its own regulations. *Tire Jockey Serv., Inc. v. Dep't of Envtl. Prot.*, 591 Pa. 73, 110, 915 A.2d 1165, 1187 (2007). Accordingly, DEP's interpretation is accorded deference and "is given controlling weight unless it is clearly erroneous." *Riverwalk Casino, L.P. v. Pa. Gaming Control Bd.*, 592 Pa. 505, 530, 926 A.2d 926, 940 (2007). Where, as here, a regulatory scheme is technically complex, a reviewing court must put aside its discretion in favor of DEP's expertise. *Groce v. Dep't of Envtl. Prot.*, 921 A.2d 567 (Pa.Cmwlth.2007), *appeal denied*, 596 Pa. 720, 944 A.2d 759 (2008). After careful review of the relevant provisions of the regulations, the Court agrees with DEP that the spent pickle liquor is not exempt from solid waste management under 40 C.F.R. § 261.2(e)(1)(i).

■ To determine whether materials being recycled constitute a solid waste, both the material itself and the recycling activity involved must be examined. 50 Fed.Reg. 618 (1985) (preamble to the 1985 final regulations); *Am. Mining Congress*

---

6. Because EHB agreed with DEP's interpretation of the regulations, we will not address DEP's complaint that EHB failed to give proper deference to DEP's interpretation by

engaging in its own interpretation, rather than deciding whether DEP's interpretation is reasonable.

**938**

*v. United States Envtl. Prot. Agency,* 824 F.2d 1177 (D.C.Cir.1987).[7]

Table 1 to 40 C.F.R. § 261.2(c) lists "spent materials," such as spent pickle liquor, as solid wastes "when reclaimed." The term "reclaimed" is defined as follows: "A material is 'reclaimed' if it is processed to recover a usable product, or if it is regenerated. Examples are recovery of lead values from spent batteries and regeneration of spent solvents." 40 C.F.R. § 261.1(c)(4). The common and approved usage of the undefined term "regenerate" includes "to generate or produce anew;" "to form (a compound) again *chemically* from a derivative;" and "to produce again from a modified form by *chemical treatment* in a form changed physically but [usually] not to a great extent chemically from the original raw material." Webster's Third New International Dictionary 1911 (2002) (emphasis added).

As DEP's environmental engineer, Carl Spadaro, testified, the spent pickle liquor is a "waste" because it is contaminated and no longer usable by the steel manufacturers to treat the steel. N.T. at 391; R.R. at 135a. The generators of the spent pickle liquor do not immediately use it on-site as part of their ongoing manufacturing process and instead send it to AMROX's off-site facility for recycling. Therefore, the spent pickle liquor processed by AMROX does not fall within 40 C.F.R. § 261.4(a)(17), which excludes from the solid waste classification "[s]pent materials . . . *generated within the primary mineral processing industry* from which minerals, acids, cyanide, water, or other values are recovered by mineral processing or by beneficiation." (Emphasis added.) As the District Court explained: "EPA need not regulate 'spent' materials that are recycled and reused in an *ongoing* manufacturing or industrial process. These materials have not yet become part of the waste disposal problem; rather, *they are destined for beneficial reuse or recycling in a continuous process by the generating industry itself.*" *Am. Mining Cong.,* 824 F.2d at 1186 (emphasis in original). *Compare Am. Petroleum Inst. v. U.S. Envtl. Prot. Agency,* 906 F.2d 729 (D.C.Cir.1990) (EPA has authority to regulate a K061 hazardous waste delivered to a facility as part of a mandatory waste treatment plan).

In addition, the spent pickle liquor is distinguishable from "[s]pent sulfuric acid used to produce virgin sulfuric acid," which is excluded from the definition of solid waste under 40 C.F.R. § 261.4(a)(7). The processing of the spent sulfuric acid involves reintroducing such material "into the original sulfuric acid production process." 50 Fed.Reg. § 642 (1985). EPA explained:

> In this operation, spent sulfuric acid is introduced as a feedstock where it is burned to derive sulfur as $SO_2$. As part of the same process, this $SO_2$ is then purified, catalytically converted, and absorbed into existing sulfuric acid. This process does not constitute reclamation because the spent sulfuric acid is neither regenerated (impurities are not removed from the spent sulfuric acid to make it reusable) nor recovered . . . (acid values

**7.** EPA's preambles to proposed or final regulations are considered to be "authoritative as a primary guidance document" in interpreting the solid waste regulations. *Groce,* 921 A.2d at 577. In addition, federal court decisions provide guidance and persuasive authority in interpreting the federal statutes and regulations. *See Commonwealth v. 502–504 Gordon St.,* 147 Pa.Cmwlth. 330, 607 A.2d 839 (1992), *aff'd,* 535 Pa. 515, 636 A.2d 626 (1994).

are not recovered from the spent acid). It is being used as an ingredient.

48 Fed.Reg. 14,487 n. 30 (1983).

Spent materials "are regenerated when they are processed to remove contaminants in a way that restores them to their usable original condition." 50 Fed.Reg. 633 (1985). EPA further explained reclamation of spent material as follows:

> We also drew a distinction ... between situations where *material values in a spent material,* byproduct, or sludge are *recovered as an end-product of a process* (as in metal recovery from secondary materials) as opposed to situations where these secondary materials are used as ingredients to make new products *without distinct components of the materials being recovered as end-product.* The former situation is reclamation; the latter is a type of direct use that usually is not considered to constitute waste management.

*Id.* (emphasis added).

As to the processing of spent pickle liquor, EPA has determined that it constitutes "reclamation:"

> Another type of reclamation involves "regenerating" used products or materials so that they can be reused for their original purpose, or some other purpose. A common example of this type of reclamation is found in the steel making industry, where "pickling" acids are used to remove scale and other impurities from steel, eventually lose their acidic properties, and must be reclaimed before they can be used again as pickling agents. In this case, the reclamation

process may yield both regenerated pickling acid, as well as a marketable iron oxide product.

68 Fed.Reg. 61565 (2003). The spent pickle liquor received by AMROX is contaminated with water, debris, iron oxide[8] and other toxic metals. AMROX removes water, debris and other impurities from the spent pickle liquor using the Venturi scrubber/separator. The chemical reactions that occur during the subsequent pyrohydrolysis process produce iron oxide and hydrochloric acid. The record thus establishes that AMROX reclaims the spent pickle liquor by recovering iron oxide and regenerating hydrochloric acid as end products of its process.

Petitioners nonetheless argue that to constitute reclamation, the recycling process must involve only a physical process, as opposed to chemical reactions. In support, AMROX relies on "recovery of lead values from spent batteries and regeneration of spent solvent" listed in 40 C.F.R. § 261.1(c)(4) as an example of reclamation, not as "a restrictive and mandatory list." *Readinger v. Workers' Comp. Appeal Bd. (Epler Masonry),* 855 A.2d 952, 955 (Pa. Cmwlth.2004). The process for reclaiming spent batteries, however, involves not only the physical "cracking" of lead plates but also "smelting"[9] of the lead, which is a chemical reaction process. 48 Fed.Reg. 14,499 n. 57 (1983).

The process utilized by AMROX is similar to the recycling process involved in *MacDermid, Inc. v. Department of Environmental Protection,* 257 Conn. 128, 778 A.2d 7 (2001). In *MacDermid,* the plain-

---

8. Petitioners assert that "there is no iron oxide 'contaminant' to be removed" from the spent pickle liquor. Petitioners' Brief at 22. They concede, however, that the spent pickle liquor contains at least *some,* although not significant, concentration of iron oxide and hydrochloric acid. *Id.*

9. The word "smelt" is defined as "to melt or fuse (as ore) often with an accompanying chemical change usu. to separate the metal." Webster's Third New International Dictionary 2151 (2002).

tiff obtained spent "etchant" [10] from customers and stored it in drums or storage tanks. The plaintiff later moved the spent etchant to vessels, added caustic soda and heated the vessels. The chemical reactions during this process produced anhydrous ammonia gas, sodium chloride, copper oxide and water. The copper oxide was washed and either sold or used by the plaintiff in its products. By combining anhydrous ammonia gas with water and hydrochloric acid, the plaintiff also produced ammonia chloride. The plaintiff argued that the spent etchant was exempt from the solid waste regulations because it was used as an ingredient to manufacture copper oxide, anhydrous ammonia gas and ammonia chloride and that none of those substances was recovered from the spent etchant.

The Supreme Court of Connecticut rejected the plaintiff's argument and upheld the state environmental protection agency's determination that the plaintiff's process constituted reclamation, not a manufacture of new products using the spent etchant as an ingredient. The Court reasoned:

> [T]he history of the regulations reveals that a claimed use or reuse of spent materials ... must be examined to determine whether the process through which the spent materials are claimed to be used or reused *is more akin to waste management than to manufacturing.* ... In its proposed rules, the agency stated that it was "somewhat concerned that [with respect to the use of materials as ingredients to manufacture products] the proposed [rule] leaves unregulated certain processes that could constitute waste management. *Processes where secondary materials are the predomi-*

*nant (or even the sole) ingredient are conceivable examples, particularly where the process operator is paid to take the materials.* In addition, processes using spent materials may be more logical candidates for regulation because spent materials (having already fulfilled their original use) are *more inherently waste-like than by-products and sludge[ ]."*

*MacDermid,* 257 Conn. at 145–46, 778 A.2d at 18–19 [quoting 48 Fed.Reg. 14,488 (1983) (emphasis added)].

■ We find the MacDermid Court's reasoning persuasive. Here, Petitioners are *paid* to take and process the spent pickle liquor that has served the original purpose of treating the steel. Without further processing, the spent pickle liquor is "inherently waste-like." 48 Fed.Reg. 14,488 (1983). AMROX removes the contaminants from the spent pickle liquor, recovers iron oxide and regenerates hydrochloric acid. The fact that AMROX's operation involves both a physical process and chemical reactions and produces "something of value" is immaterial. *Am. Petroleum Inst.,* 906 F.2d at 741 n. 16.

Moreover, AMROX's process does not meet the definition of "used or reused." A material is "used or reused" for the purpose of Section 261.2(e)(1)(i), if it is:

> Employed as an ingredient (including use as an intermediate) in an industrial process to make a product (for example, distillation bottoms from one process used as feedstock in another process). However, a material will not satisfy this condition *if distinct components of the material are recovered as separate end products (as when metals are recovered*

---

10. The chemical "etchant" is used to dissolve excess copper from printed circuit boards. *MacDermid,* 257 Conn. at 130, 778 A.2d at 10. During use, the etchant is contaminated with copper salts that eventually render it "unusable, or spent." *Id.*

*from metal-containing secondary materials).*

40 C.F.R. § 261.1(c)(5)(i) (emphasis added). AMROX recovers distinct components of the spent pickle liquor, *i.e.,* iron oxide and hydrochloric acid, as separate end products of its process. AMROX's process, therefore, fails to meet the exemption under Section 261.2(e)(1)(i).

### III.

Petitioners next argue that AMROX's operation falls within the exemption under 40 C.F.R. § 261.2(e)(1)(ii). Petitioners claim that AMROX uses the spent pickle liquor as a substitute for intentionally manufactured, commercially available spent pickle liquor or ferrous chloride solution to manufacture iron oxide and hydrochloric acid. They assert that AMROX "would have to purchase commercially-available" spent pickle liquor from others if its current sources are unavailable. Petitioners' Brief at 29. Pointing out that 40 C.F.R. § 261.2(e)(1)(ii) does not include the phrase "provided the materials are not being reclaimed" or "without first being reclaimed," as in 40 C.F.R. § 261.2(e)(1)(i) and (iii), Petitioners maintain that EHB erred in construing 40 C.F.R. § 261.2(e)(1)(ii) as requiring the spent pickle liquor not to be "reclaimed" in order to be eligible for the exemption.

Under the established statutory construction rule, "[w]ords and phrases which may be necessary to the proper interpretation of a statute and which do not conflict with its obvious purpose and intent, nor in any way affect its scope and operation, may be added in the construction thereof." 1 Pa.C.S. § 1923(c). Section 261.2(e)(1)(ii) exempts materials from solid wastes when they can be shown to be "recycled" by being "used or reused" as effective substitutes for commercial products. A material is recycled if it is, *inter alia,* "reclaimed."

40 C.F.R. § 261.1(c)(7). Thus, when Section 261.2(e)(1)(ii) is construed in conjunction with Section 261.1(c)(7), it is clear that materials must not first be reclaimed to be eligible for the exemption, despite the absence of a specific reference to the term "reclaimed" in Section 261.2(e)(1)(ii).

Our conclusion is also consistent with EPA's interpretation. In responding to an inquiry from a manufacturer of specialty carbon and alloy steel from scrap iron, EPA stated in 1989:

> [T]his exclusion [under 49 C.F.R. § 261.2(e)(1)(ii)] ... *would definitely not apply to the KO62 waste [spent pickle liquor].* This exclusion applies to materials which are used or reused *without reclamation* .... *The KO62 is clearly being reclaimed and, therefore, is not eligible for this exclusion.* [Emphasis added.]

DEP's Exhibit No. 8; R.R. at 692a. *See also Am. Mining Cong.,* 824 F.2d at 1180 [(the material "must not first be 'reclaimed'" to be eligible for the exemption under 49 C.F.R. § 261.2(e)(1)(ii))].

We also note that the spent pickle liquor is not "used or reused" for the purpose of 40 C.F.R. § 261.2(e)(1)(ii). A material is "used or reused" under 40 C.F.R. § 261.2(e)(1)(ii), if it is "[e]mployed in a particular function or application as an effective substitute for a commercial product (for example, spent pickle liquor used as phosphorous precipitant and sludge conditioner in wastewater treatment)." 40 C.F.R. § 261.1(c)(5)(ii). The example set forth in 40 C.F.R. § 261.1(c)(5)(ii) applies only when the spent pickle liquor is *directly* used for a phosphorous precipitant and sludge conditioner and "does not regenerate or recover the pickle liquors." 48 Fed. Reg. § 14,488 (1983). AMROX does not *directly* employ the spent pickle liquor for a particular function or application *before* it becomes "part of the waste disposal

problem;" rather, it is sent by the generators to AMROX for processing. *Am. Mining Cong.*, 824 F.2d at 1186.

Further, Petitioners' assertion that the spent pickle liquor is a "commercially available" product is not supported by the record. Petitioners rely on a letter submitted by Michael Sieckmann of International Steel Services, Inc. in 1995 to support AMROX's application for co-product determination. In that letter, Sieckmann stated that the spent pickle liquor processed by AMROX was equivalent to "the physical characteristics and the chemical composition of the manufactured product (Ferrous Chloride)." R.R. at 221a. He further stated: "Waste Pickle Liquor (proposed CoProduct) will be transferred as a commodity in trade for use in place of an intentionally manufactured product. AMROX will pay for the Waste Pickle Liquor and transport to the AMROX facility as feedstock." R.R. at 222a. EHB did not accept his statements in this proceeding. Moreover, AMROX failed to present any evidence supporting Sieckmann's statements that the spent pickle liquor, a hazardous waste, is "intentionally manufactured" or traded as "a commodity."[11] Rather, the record shows that AMROX was *paid* by the steel manufacturers to take and process the spent pickle liquor.

Nor does Spadaro's testimony, relied on by Petitioners, establish that the spent pickle liquor is commercially available. Wheeling Steel's employee, Pat Smith, made a distinction "between spent pickle liquor which would not go to AMROX and ferrous chloride which would go to AMROX." N.T. at 168; R.R. at 56a. Later,

the following exchange then took place between Petitioners' counsel and Spadaro:

Q. But again, are you saying this is hydrochloric acid that is contaminating the product or are you saying that this is ferrous chloride solution that comes in to AMROX?

A. I'm saying it's spent pickle liquor.

Q. That wasn't one of your two choices but ... is there a difference between spent pickle liquor and ferrous chloride solution in this case?

A. The ferrous chloride solution, I'm sorry the spent pickle liquor from Wheeling–Pittsburgh Steel and U.S. Steel compares favorably to intentionally manufactured commercially available ferrous chloride solution.

Q. Okay. So, let me try the choices again. Are you saying, and I'll try to use your terms, are you saying that it's hydrochloric acid that comes in that is contaminated or are you saying it's the spent pickle liquor that comes in to AMROX process?

A. Spent pickle liquor.

N.T. at 391–92; R.R. at 135a.

EHB rejected Petitioners' attempt to distinguish spent pickle liquor from ferrous chloride solution. The spent pickle liquor is an inherently waste-like material. Spadaro repeatedly stated that the spent pickle liquor generated by the steel manufacturers is a waste. His isolated statement made in response to counsel's attempt to distinguish the spent pickle liquor from ferrous chloride solution alone, without further supporting evidence, does not

---

11. Petitioners also assert that the Consent and Agreement entered into between DEP and AMROX on August 2, 2005, to settle the violation charges against AMROX stated that in issuing the 1996 co-product determination, DEP indicated that AMROX used the spent pickle liquor "as an effective substitute for commercial product." R.R. at 197a. That statement, however, refers to DEP's co-product determination issued under the former regulations. Such procedure is no longer available and is not controlling in determining the exemption under 40 C.F.R. § 261.2(e)(1)(ii).

establish that the spent pickle liquor is in fact a commercially available product. The fact that AMROX is paid to take the spent pickle liquor belies Petitioners' assertion.

Hence, the spent pickle liquor processed by AMROX is ineligible for the exemption under Section 261.2(e)(1)(ii).

## IV.

■ Petitioners further argue that EHB erred in refusing to reopen the record for the purpose of permitting them to present a document titled, "Impact on the Regulated Community of Possible Changes in the Definition of Solid Waste: Use, Reuse, Recycling, Reclamation" (Impact Report). R.R. at 1106a. A petition to reopen the record is governed by 25 Pa.Code § 1021.133(b), which provides:

The record may be reopened upon the basis of recently discovered evidence when all of the following circumstances are present:

(1) Evidence has been discovered which would conclusively establish a material fact of the case or would contradict a material fact which had been assumed or stipulated by the parties to be true.

(2) The evidence is discovered after the close of the record and could not have been discovered earlier with the exercise of due diligence.

(3) The evidence is not cumulative.

A decision to grant or deny a petition to reopen the record is within the administrative agency's discretion and will not be disturbed absent a clear abuse of discretion. *Upper Moreland Twp. Dist. v. Pa. Labor Relations Bd.*, 695 A.2d 904 (Pa. Cmwlth.1997); *Ball Incon Glass Packaging v. Workmen's Comp. Appeal Bd. (Lentz)*, 682 A.2d 85 (Pa.Cmwlth.1996).

■ The Impact Report was prepared by EPA contractor, JRB Associates, in 1983 based on written comments received by EPA on the proposed regulations. The Impact Report stated that generators of spent pickle liquor would be subject to "reduced hazardous waste requirements." R.R. at 1173a. Such statement does not "conclusively" establish material facts supporting Petitioners' claim. Even if it does, it would be cumulative of the evidence they presented at the hearings. In addition, the 1983 preamble to the proposed rules specifically refers to the Impact Report as one of the impact studies performed by EPA. *See* 48 Fed.Reg. 14,500 (1983). Thus, with due diligence, Petitioners could have discovered the Impact Report, which had been available to the public since 1983, before the close of the hearings. Any alleged delay in actually obtaining the Impact Report from EPA does not constitute a valid reason for reopening the record under 25 Pa.Code § 1021.133(b). EHB did not abuse its discretion in denying the petition to reopen the record.

## V.

Finally, Petitioners argue that Condition No. 5 (requiring the generators of spent pickle liquor to obtain prior written approval from DEP) and Condition No. 6 (setting forth the maximum and minimum chemical parameters) are not reasonable. According to Petitioners, AMROX is the best-situated party to safeguard its process, and those conditions would result in a market disadvantage, placing an onerous burden on AMROX's ability to conduct business.

■ DEP's actions may be reversed only if they were made in bad faith or constitute a manifest or flagrant abuse of discretion or a purely arbitrary execution of its duties and functions. *Tire Jockey.* The criteria for granting a variance for

materials that are reclaimed and used as a feedstock include "[t]he extent to which the material is handled before reclamation to minimize loss;" "[t]he time period between generating the material and its reclamation;" "[t]he location of the reclamation operation in relation to the production process;" "[w]hether the person who generates the material also reclaims it;" and "[o]ther relevant factors." 40 C.F.R. § 260.31(b)(2)-(4) and (6)-(7).

■■■ EHB's finding that Condition Nos. 5 and 6 are reasonable is amply supported by the evidence of the potential risks posed by the storage and handling of the spent pickle liquor. In issuing the co-product concurrence in 1996, DEP imposed the similar limitations on chemical parameters of the spent pickle liquor. *See* N.T. at 310; R.R. at 115a. In 2004, AMROX's two storage tanks failed and spilled the spent pickle liquor into the surrounding asphalt-paved area and into the storm drain. Consent Order and Agreement dated August 2, 2005, ¶ L; R.R. at 498a. Spadaro testified that the chemical parameter limitations are necessary to prevent excessive amounts of chloride acid in the spent pickle liquor from causing accelerated corrosion or damage to the storage tanks located only fifty feet from a playground. N.T. at 323; R.R. at 118a. DEP was also concerned about air pollution from the concentration of metals in the spent pickle liquor. *Id.* High levels of ammonia nitrogen could cause an odor problem. *Id.* Further, AMROX may seek a modification of the limitations as it did in the past. The mere inconvenience to the spent pickle liquor generators in complying with the conditions does not compel a finding that the conditions are unreasonable.

Accordingly, EHB's orders are affirmed.

### *ORDER*

AND NOW, this 6th day of August, 2009, the orders of the Environmental Hearing Board in the above-captioned matter are hereby AFFIRMED.